No. 12.—WILLIAM B. BROWN and others, plaintiffs in error, *vs.* LEWIS REDWYNE and another, defendants in error.

[1.] After a case in Equity has gone to the Jury, it may be amended, by the addition to it of copies of exhibits.

[2.] In a judgment of the Court of Ordinary, that Court makes recitals concerning matters over which it has jurisdiction: *Held*, that the Superior Court must presume the recitals to be true, until proved to be untrue.

[3.] An order of the Court of Ordinary, giving to an administrator leave to sell land, recites that the administrator had given notice " in terms of the law", of his intended application for the leave.    This order is in evidence : *Held*, not to be necessary that this should also be recited in the administrator's deed, to make the deed admissible as evidence.

[4.] The notice of the sale of land, which an administrator is required to give " at the door of the Court-house", as soon as the time of sale has passed, perishes, it is to be presumed ; and therefore, secondary evidence of its contents may, at any time after the sale, without further foundation than this presumption, be introduced.

[5.] A Court of Equity cannot enjoin a person not to bring an action of eject-

ment, against whom not so much as one final verdict in ejectment for the same land, has been obtained by the person praying for the injunction.

[6.] The objection, that a Court of Equity cannot so enjoin a person, may be taken after the filing of the answer, and as late as when the Court is charging the Jury.

In Equity, in Coweta Superior Court. Tried before Judge WARNER, March Term, 1854.

Lewis Redwyne filed his bill in the Superior Court of Coweta county, stating, that under the Lottery Act of 1825, disposing of that portion, of the territory of Georgia, which lies between the Flint and Chattahoochee rivers, one James St. John drew Lot Number 161, in the first district of said County, and that the same was granted to him by the State, on the 11th day of October, 1828; that on the 20th of the same month and year, St. John conveyed the land to one Michael Madden; that shortly thereafter, Madden conveyed to one Giles B. Taylor; these deeds contain no covenant of the warranty of title; that in October, 1829, Taylor conveyed, with warranty, to Shadrack Perry; that in June, 1831, Perry conveyed, with warranty, to John Redwyne; that John Redwyne, in Sept. 1831, conveyed, with warranty, to complainant, Lewis Redwyne; that Lewis Redwyne afterwards sold and conveyed the land, with warranty, to one David Dominick, who having died intestate, the land was regularly sold and conveyed by Wm. B. Shell, his administrator, to Sterling Elder : all the deeds were regularly recorded in the proper office; that Elder took actual possession of the land, and made valuable improvements thereon. The bill alleges, that the title was well known and recognized by all persons, previous to that time.

The bill further charges, that William B. Brown, with a full knowledge, and actual notice of all the facts, and especially of the purchase and claim of the said John and Lewis Redwyne, as well as the possession of the said Elder, combining with St. John, the grantee, to injure and defraud complainant for some nominal or inconsiderable sum, bought the lot of land of the said St. John, and took from him a deed, or some other written conveyance of the property. It alleges that St. John and

Madden are insolvent, and that Madden resides beyond the jurisdiction of the State, so that neither of them can be made answerable in damages for the loss of the land; and that the said confederates are prosecuting an action of ejectment, in the name of the said St. John, against the said Elder and the complainant, who was made a co-defendant thereto, by order of the Court. The bill further states, that the two witnesses to the deed, from St. John to Madden, are dead, and that the complainant cannot adduce proof of its execution, without appealing to the conscience of the said St. John. The bill prays that the deed from St. John to Brown may be decreed to be fraudulent and void, and delivered up to be cancelled, or that Brown be adjudged to be a trustee for the said Elder, or the complainant, and be compelled to convey to Elder; and that the action of ejectment may be perpetually enjoined.

The defendants answered the bill, but it is unnecessary to set forth their answers.

At the March Term, 1854, of said Superior Court of said County, a trial was had on the bill and answers.

The complainants offered, in evidence, an exemplification of the ejectment case pending in said Court. To which defendants objected, on the ground "that there was no exhibit of the same to the bill." The Court sustained the objection, but allowed complainant to amend his bill, by attaching the said exemplification as an exhibit, to which defendant objected, unless complainants showed special cause for it. Complainant showed for cause, "that when the bill was filed, it was not the practice in the Circuit, to make such averments in bills in Equity."

Defendant then moved the Court to make Sterling Elder, the tenant in possession, a party complainant with Redwyne, his warrantor; to which complainant objected. The Court sustained the motion, and Elder was made a party complainant.

Complainants then offered, in evidence, a deed from Redwyne to David Dominick, to which defendants objected, because the same was not attached as an exhibit to the bill. The Court sustained the objection, but allowed complainants to amend their bill in this respect, on the ground that Elder had, at the

instance of defendants, been made a party complainant, and said deed was a link in Elder's chain of title to the land, and defendants excepted.

Complainants then offered in evidence, a deed from Wm. B. Shell, as administrator of David Dominick, to Sterling J. Elder, to which defendants objected on the same ground.   The Court sustained the objection, but allowed complainants to amend their bill, by attaching said deed as an exhibit, and defendants excepted.   Defendants further objected to the introduction of said deed, because it was an administrator's deed, and his authority to sell must first be shown.   The Court sustained the objection, when complainants tendered in evidence two orders; one purporting to be an order from the Court of Ordinary of Coweta County, appointing Shell administrator of Dominick; the other calling him "administrator on the estate of David Dominick, deceased," and granting him leave, as such administrator, to sell the real estate of Dominick, after reciting the usual notice of application for leave to sell, &c.   To the first order defendants objected, because the minutes of the term of the Court of Ordinary, at which said order was granted, was not signed by said Court, as required by law.   The Court sustained the objection, and ruled out the order.   The defendants also objected to the second order, because the first order being ruled out, there was no evidence of the appointment of Shell, administrator of Dominick.   The Court over-ruled the objection, and admitted the order in evidence; and this was excepted to by the defendant.   Defendant then objected to the administrator's deed, because, first, "it did not appear, in said deed, that the administrator had given the legal notice for application for leave to sell."   2d. "It did not appear, from the deed, that the sale of the land had been advertised at the Court-house door in Coweta county."

The Court over-ruled the first objection, and defendant excepted.

Complainants then introduced Richard M. Hackney, who testified; "that to the best of his recollection, he saw, before the sale, on the Court-house door, an advertisement of the sale

by the administrator." Defendant objected to the evidence. The Court over-ruled the objection, and allowed the deed to be read to the Jury, stating, "that whether the sale was advertised, was a fact, which, under the evidence, he would leave to the Jury." To all of which rulings by the Court, defendants excepted. The Court, among other things, charged the Jury, in substance, that if they believed the land was granted by the State to St. John, and that all the intermediate deeds, down to Sterling J. Elder, were genuine, and regularly executed, they should find a decree for the complainants; for in that event, Elder would have a complete legal title to the land; and in that case, they should decree that the Common Law action should be perpetually enjoined.

The defendants requested the Court to charge the Jury, "that a decree of perpetual injunction cannot be made in this case, inasmuch as there has been but one action of ejectment instituted by defendants for the recovery of the land." Upon which, the Court charged, "that if this objection existed, it should have been taken advantage of by demurrer, or at least at an earlier stage of the case, and that it is now too late to insist upon it." The Court further charged the Jury, "that if they believed, from the evidence, that St. John, through mistake or fraud, by Madden or any one else, executed the deed in evidence to Madden, though he may have intended, at the time, to have executed his bond for titles to the land, and they should believe that the deed from Madden to Taylor is genuine: provided these facts are alleged in the bill, and sufficiently proven, and they should believe, from the evidence, that Perry, John and Lewis Redwyne, nor either of them had any notice of such mistake or fraud, but were *bona fide* purchasers for a valuable consideration, that they should find for the complainants. To which charges, Counsel for defendant excepted.

The Jury found and returned into Court, on Saturday night, about the hour of 9 o'clock, a verdict in favor of complainants. Whereupon, Counsel for defendants notified the Court of their intention to file a rule *nisi* for a new trial, and asked the Court to prolong the session of the Court to the hour of mid-

night, (when that term of the Court expired by operation of law) to give them an opportunity to make out and file said rule ; which the Court refused to do, and adjourned the Court, and ; defendants excepted and on these several exceptions, have assigned error.

BUCHANAN & McKINLEY, for plaintiff in error.

DOUGHERTY & FREEMAN, for defendant in error.

*By the Court.*—BENNING, J. delivering the opinion.

What is an " exhibit ?"   Is it a thing belonging to pleading or to evidence?   It is said, in 1 *Daniel's Ch. Pr.* 475–6, *Marg.* "that in stating deeds or other written instruments in a bill, it is usual to refer to the instrument, itself, in some such words as the following, viz : ' as in and by the said indenture, reference being thereunto had when produced, will more fully and at large appear'.   The effect of such a reference, is to make the whole document referred to, part of the record.   It is to be observed, that it does not make it evidence ; in order to make a document evidence, it must, if not admitted, be proved in the usual way ; but the effect of referring to it is, to enable the plaintiff to rely upon every part of the instrument, and to prevent his being precluded from availing himself, at the hearing of any portion, either of its recital or operative part, which may not be inserted in the bill, or which may be inaccurately set out.   Thus, it seems that a plaintiff may, by his bill, state simply the date and general purport of the deed under which he claims, and that such statement, provided it be accompanied by a reference to the deed itself, will be sufficient".

It is this sort of a reference to a writing, which makes the writing become an exhibit.

The sole office, then, of an exhibit—of making a writing become an exhibit, is to help out a pleading—to help out allegations in a bill or answer, in case it should be found,

Brown and others *vs.* Redwyne and another.

on the trial, that such allegations do not give some needed particulars of the writing, or do not give the writing with accuracy. It is no part of that office to convert into evidence the writing made an exhibit of, or to be a pre-requisite to the admission of the writing as evidence. If the writing is made an exhibit of, still, it must (unless admitted) be proved, if proved, but not made an exhibit of; still, if in itself legal, and if adapted to the allegations, such as they may be, it is to be received as evidence.

This is what an exhibit is by the law of England—by that law, as it was when adopted by Georgia. Is it any thing different, by the law of Georgia, as that law now stands?

The *Seventeeth Equity Rule* says, that " copies of all deeds, writings and other exhibits, shall be filed with the bill or answer, and no other exhibits shall be admitted, unless by order of the Court, for some special and good cause shown". " No other exhibits shall be *admitted*"—how admitted? As evidence? As *evidence*, no writings, even before the making of this rule, as we have seen, could, by virtue merely of having been made exhibits of, be admitted; neither writings, of which copies might have been filed, nor those of which copies might not have been filed. To make these words, therefore, mean to say, that writings, of which no copies have been filed, shall not, although referred to as exhibits, be evidence, is to make them mean to say what already stood, said by the general law. What, then, do the words mean? This: No writings shall be "admitted", received, considered as exhibits—shall be allowed to do the office of exhibits, except those of which copies may have been filed: whereas, the old rule had said, that any writing might be made a part of a bill, by being properly referred to, without being copied into the bill; this, the new rule, says that no writing shall, however referred to, become a part of bill or answer, without a copy of it has been filed with the bill or answer.

Thus, the new rule is but the old rule, a little contracted.

This being so, if, in bill or answer, the pleader refers to a writing, and professes to file a copy of it, but does not file one,

XVI–10

the omission is a defect in *pleading*, if defect at all—a defect by which he *may* fail to get all the benefit from the writing, which, had a copy been filed, he might have got—a defect by which he *will* fail to get all that benefit, if, in setting out the writing, so far as he has set it out, he has set it out inaccurately, or has not set out some parts of it which he needs : and thus, being a defect in pleading, when the writing, that of which no copy has been filed, comes to be offered as evidence, the only questions will be, does the writing fit the descriptive allegation? may the whole and every part of the writing be contained in the allegation, or only some part of it be so contained? has there been accuracy in the description? If yes may be answered to these questions, the writing is to be read as evidence—all of the writing, if, as to all of it, the descriptive allegation is good—part only, if, as to part only, that allegation is good.

Now, in the bill in this case, there were allegations to the effect, that St. John & Brown were, in the name of St. John, in Coweta Superior Court, prosecuting an action of ejectment against the complainants in the bill, Redwyne & Elder ; that Redwyne had made a deed for the land to Dominick ; that Shell, as administrator of Dominick, regularly sold and conveyed the land to Elder : but no copy of the ejectment or of either of these deeds, was filed with the bill ; and merely for that omission, the originals were considered by the Court not to be admissible as evidence. But, as we have seen, the admission or rejection of the originals should have been made to turn upon another thing, namely : the nature of the allegations—the allegations aforesaid. And looking to the nature of the allegations, it was such as to make the originals admissible. The allegations were such as to be in the spirit of Lord *Coventry's* order, " that bills, answers, replications and rejoinders, be not stuffed with repetitions of deeds or writings, in *haec verba*, but the effect and substance of so much of them, only, as is pertinent and material to be set down, and that in brief and effectual terms". (1 *Dnal. Ch. Pr.* 469, *marg*.) Such "stuffing" is expensive and otherwise hurtful. Not a single reason is appa-

rent, why copies of these originals should have been added to the general allegations aforesaid, which give their " effect and substance".

The Court, therefore, if so inclined, might, under these allegations, well have admitted the originals as evidence.   This the Court would not do, but as a pre-requisite to their admission, required the complainants to amend their bill, by filing copies of the originals.   This was an error, of which the *complainants* had the right to complain; but it was the *defendants* that made the complaint.   The defendants excepted to the decision allowing this amendment to be made.   They insisted, that in the stage in which the case then was, the case being before the Jury, such amendments could not be made.   But a plaintiff " may, after replication has been filed, and the cause is at issue, have leave to amend his bill, and this even after witnesses have been examined in the cause and publication passed".   (1 *Daniell's Ch. Pr.* 544, *marg.*)

And the Act of the last Legislature, " to change and simplify the practice and pleadings in this State," &c. among other things, declares that " parties, plaintiffs and defendants," " whether at Law or in Equity, may, in any stage of the cause, amend their pleadings in all respects, whether in matter of form or matter of substance".

[1.] In allowing the amendments, therefore, the Court did nothing which, as against the *defendants* in the bill, was wrong.

The order of the Court of Ordinary, granting Shell leave to sell the land, called him the "administrator on the estate of David Dominick", and it recited that he had " given notice, in terms of the law, that he would apply to" that " Court, for an order to sell all the real estate", &c.

[2.] This order, the Court was right, as we think, in holding to be sufficient *prima facie* evidence of the appointment of Shell as administrator.

It is not to be presumed by one Court, that another, concerning matters over which that other has jurisdiction, and in a usual sort of proceeding touching such matters, recites, as true, things which are not true: rather, that it recites only such

things as are true, is, in the first instance, to be presumed. Is the Court of Ordinary such a Court as not to be entitled to the benefit of a principle so obvious? If it is, what makes it such? Its being a Court of limited jurisdiction? Speaking for myself, I must say that I know of nothing sufficient, on *this* account, to make the Court of Ordinary a Court not entitled to the benefit of such a presumption, that is not equally sufficient to make the Superior Court a Court not entitled to the benefit of the same sort of a presumption. And in this, I think myself supported by much of what was said, if not by what was done, in *Tucker vs. Harris,* (13 *Ga. R.* 1.) The Superior Court, itself, has limits to its jurisdiction.

I may, in like manner, say that I am not aware of any law, which makes the minutes of the Superior and Inferior Courts *void,* if not signed by the respective Judges of those Courts. Certainly the Act which requires such minutes to be so signed, does not say the omission to sign is to render void the minutes. To keep the minutes, is made the duty of the Clerks, not that of the Judges. These minutes, thus kept, the Judges, it is true, are commanded to sign; but should they disobey the command, is the penalty, if any, to fall on them who are the guilty, or upon suitors who are the innocent? If not upon them, what inducement have they to obey the command, if upon the suitors? Whence are they to get their reparation? How easy to have said, "and unless so signed, the minutes shall be void". But this the Legislature did not say. What warrant, then, have Courts to say it? · (*Pr. Dig.* 428.)

The objections to the admission of the deed of Shell, as administrator, were—First, That it did not appear, from the deed, that the administrator had given notice of his intended application for leave to sell. Second, That it did not appear, from the deed, that the sale of the land had been advertised at the Court-house door.

[3.] As to the first of these objections to it, the order for leave to sell, with its recitals, was an answer; for among those recitals, is one to the effect that Shell, the administrator, "in terms of the law", had given notice of such, his intended appli-

cation.   Being contained in the order, and the order being in evidence, it was not necessary that this recital should also be contained in the deed, to make the deed admissible as evidence.

As to the second, the testimony of Hackney was an answer to it.

To preserve a notice of this sort, stuck on a Court-house door, after the day of sale has passed, whose duty is it?   Must it not be torn off the door, to make room for other notices and advertisements, that the law is every day requiring to be put there?   The presumption is, that such a notice, as soon as it has discharged its office, perishes.

[4.] That being presumed, in this case, Hackney's testimony, as to the contents of the notice, &c. was at once admissible. And having been admitted, it was sufficient, as we think, to warrant the introduction of the deed as evidence.   And the Courts leaving the question of the sufficiency of Hackney's testimony to the *Jury*, if wrong, was wrong merely in giving the defendants more than they were entitled to.   We do not, however, say we think it to have been wrong.   As to that, we say nothing.

The Court being requested to charge the Jury, "that a decree of perpetual injunction" could not be made in the case, "inasmuch as there" had "been but one action of ejectment instituted by defendants, for the recovery of the land", charged "that if this objection existed, it should have been taken advantage of by demurrer, or at least, at an earlier stage of the case, and that it" was then "too late to insist upon it".

Was this right?   The Court seems to admit, that if a demurrer had been filed to the bill, on the ground stated in the request to charge, the demurrer must have been sustained.

The Court denies, however, that the ground had any virtue in it, at the late stage of the cause, when the ground was brought to the notice of the Court—the stage when the Court was in the act of charging the Jury.

*Mitford* says: " actions of ejectment having become the usual mode of trying titles at the Common Law; and judgments in those actions not being in any degree conclusive, the

Courts of Equity have interfered; and after repeated trials and satisfactory determinations of questions, have granted perpetual injunctions to restrain further litigation; and thus have, in some degree, put that restraint upon litigation, which is the policy of the Common Law, in the case of real actions". And he cites many cases in support of this proposition. (*Mitford's Eq.* 144 *and note x.*)

It appears, therefore, that Courts of Equity "have interfered, and *after repeated* trials and satisfactory determinations of questions, have granted perpetual injunctions to restrain further litigation; but it does not appear that they have ever interfered, *before* there has been such trials, or something, in the estimation of those Courts, equivalent to such trials. And it is now too late for them to begin—at least, it is in Georgia—a State which, by its Constitution, has fenced off its Courts from whatever is legislative territory. But if the Courts had the power to enlarge this much questioned—most questionable branch of Equity jurisdiction, ought they to have the will? When A asks a Court to command—" enjoin" B not to sue him, A—to command B not to go into any of the Courts, though open to all men, and complain of him, A, saying but barely this : "A has done me an injury. May it please the Court to command A to repair that injury, or show cause why he will not"—asks a Court to command B not to do towards him, A, what the law says every man may do towards every other man—asks a Court to suspend, in his favor, a law of the land, is it too much for the Court, before granting the request, to require of him, A, to show, beyond the shadow of a doubt, that by the granting of the request, it will hardly be possible for any harm to come to B, whilst to him, A, it will be certain that some, perhaps much, good will come ? Too much to require of him to show B to have repeatedly made that same complaint against him, A, and the complaint, as repeatedly to have been fairly and fully tried, and every time with the same result—a verdict in his, A's favor: and thus, to show that the complaint, if allowed to be persisted in and pressed to a trial, would, of necessity almost, result in the same sort of a verdict.

[5.] More to be shown than this, if as much as this is not required by the aforesaid rule, taken from *Mitford*.   That rule seems to have been admitted to be true, as a general rule, by the Court below: but that Court considered it, not to justify the objection in this case, because the objection, in the opinion of the Court, came too late—came not until the Court was in the act of charging the Jury.   Did the objection then come too late ?

The general rule is thus stated by *Mitford :* "In general, if a demurrer would hold to a bill, the Court, though the defendant answers, will not grant relief."   (*Mit. Plea.* 130.)   In *Bond vs. Murdock et al.* (10 *Ga. R.* 395,) a case, in many respects not unlike this, the rule as thus stated, was, by this Court, acted on.   In that case, after the coming in of the answer, the bill was, on motion, dismissed for the want of equity, and the want of equity consisted in this, that the complainant, who was seeking to enjoin an ejectment, had never had in his favor a verdict in ejectment.

And, indeed, it may be well asked, if a Court has no jurisdiction of a case, will not its judgment in the case be worthless ? The sooner, therefore, it gets rid of such a case the better.   It follows, that in whatever stage of a case the objection, for want of jurisdiction, is taken, it is better to sustain it then, in that stage, than to let the case go on and end, at last, in a worthless judgment.

[6.] In this case, then, the objection did *not* come too late. The Court should have charged on this point, as it was requested to do.

And if the Court should so have charged the Jury, it ought not to have charged them that they might find for the complainants, should they believe the allegations in the bill to have been proved: that is, might, according to the prayer of the bill, perpetually enjoin the defendants from suing the plaintiffs in ejectment.   In no event, as the case stood—stood without the existence of as much as one final verdict in ejectment in favor of the complainants,  could the Jury have been justified in rendering such a verdict as that.   The fact, if fact it was, that the

deed of St. John to Madden, was made by St. John acting under the belief, that in making the deed, he was only making a bond for titles, instead of a deed—acting in this belief, by mistake, accident or the fraud of Taylor or Madden, could not avail to give the claimants, under that deed, a better right to a perpetual injunction, than the fact, if such had been the fact, that this deed was, beyond question, a good deed—the genuine intended deed of St. John, could have availed to give them such a right. And to give such a right, a deed of the latter sort, without the help of recoveries in ejectment, would not, as we have seen, have been sufficient. If a good deed would not be sufficient, much less would a deed not good, be sufficient.

Was there, then, no equity in this bill? The bill was not wholly without equity. It is alleged in it, that the witnesses to the deed from St. John to Madden, are dead, and that the complainants cannot adduce proof of its execution, without appealing to the conscience of St. John. That deed is a necessary link in the chain of the complainants—a link, without which they cannot defend the suit in ejectment. They have a right, then, to ask equity to mend the broken link; to ask equity to put that deed in a condition in which they may use it in their defence, at Law, against the ejectment—to ask equity to declare or decree that deed to be the deed of St. John; and until such decree, to enjoin the Common Law suit. Armed with this decree, they will be as well armed to go into the defence of the Common Law suit, as they would be, were the witnesses to the deed alive and within reach. And this is all the equity they have.

And the Court, instead of telling the Jury what it did, should have told them that the only relief which they could give the complainants, if, by the evidence, they could give them any, would be to find this deed—this alleged deed—to be the deed of St. John.